IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-143

Filed 5 November 2024

Guilford County, No. 16JT137

IN THE MATTER OF: A.K.H.

Appeal by respondent from judgment entered 19 October 2023 by Judge Ashley
Watlington-Simms in Guilford County District Court. Heard in the Court of Appeals
9 October 2024.

*J. Thomas Diepenbrock, for the respondent-appellant father.*

*Mercedes O. Chut, for the petitioner-appellee Guilford County DHHS.*

*Administrative Office of the Courts GAL Appellate Counsel, Robert C.
Montgomery, for guardian ad litem.*

TYSON, Judge.

Anthony Wayne Hicks ("Respondent") appeals from order entered 19 October
2023, which terminated his parental rights. We affirm.

## I. Background

Respondent is the biological father of "Alice," born February 2014. Alice lived
with her mother, Shona Holley; Ronald Collins, her mother's boyfriend; "Ava," Holley
and Collins' daughter; and, "Walter," Holley and William Griffith's son. *See* N.C. R.
App. P. 42(b) (pseudonym used to protect the identity of minors).

Guilford County Department of Health and Human Services ("DHHS")
received a report of purported domestic violence between Holley and Collins. The

report alleged Collins had assaulted Holley and had thrown Walter across a room. Law enforcement officers reported they observed lacerations, scratches, and bruises on Holley and a swollen abrasion on Walter's forehead.

Holley admitted the allegations of domestic violence. She also told investigators she had multiple mental health diagnoses, including: schizophrenia and bipolar disorder. She stated the family had been living in her maternal grandfather's residence, but he had recently passed away. The family was required to move and had no place to go.

DHHS referred Holley to a shelter for domestic violence victims, but she declined to go. DHHS entered into a safety plan with Holley, which required her to live apart from Collins and to keep him away from the children. DHHS made unannounced visits to the home on 28 January 2016 and 2 February 2016. Collins was present and inside the home during both visits. DHHS filed juvenile petitions alleging Alice, Ava, and Walter to be neglected and dependent and obtained nonsecure custody of all three children on 4 February 2016. The trial court adjudicated all three children as neglected and dependent on 26 May 2016.

DHHS contacted Respondent on 2 March 2016 and requested he respond to the Department. Respondent told a social worker over the telephone he had received the letter and requested a paternity test of Alice on 28 March 2016. Respondent underwent a paternity test the same day. Respondent was notified he was Alice's father on 20 April 2016.

The trial court appointed Amanda Feder, Esq. to represent Respondent and held an adjudication hearing on 25 May 2016. Defendant was not present. Defendant had contacted Feder and DHHS. The trial court adjudicated all three children as neglected and dependent on 25 May 2016.

Respondent entered into a case plan on 30 June 2016, which required him to *inter alia*: (1) obtain and maintain stable and safe housing for at least six months, provide a copy of his lease to DHHS, and cooperate with announced and unannounced home visits; (2) obtain and maintain employment or sufficient income to support himself and Alice for at least six months and provide proof of employment/income as requested by DHHS; (3) resolve pending criminal charges; (4) obtain a sex specific evaluation; (5) complete a parenting psychological assessment; and, (6) complete the Parent Assessment Training and Education ("PATE") Program.

The trial court held an initial disposition hearing on 11 January 2017. Respondent was residing with his mother and wife, but failed to provide DHHS with proof he was a tenant or occupant on the lease to the residence. Respondent was not employed, but he was receiving Veterans Administration disability benefits totaling $407.75 per month. Respondent completed his parenting psychological evaluation. Respondent was recommended to participate in therapy "where he can demonstrate the ability to maintain a stable and healthy lifestyle to be a consistent role model for [Alice]" and to "spend more time demonstrating his sincerity and commitment to [Alice]." Respondent also completed the PATE Program and had entered into a

voluntary child support agreement.

Respondent had not completed his sex-specific evaluation. The trial court found Respondent "had not developed a relationship with [Alice] and was not actively participating in parenting [Alice]."

Respondent had been arrested during 2002 in Hillsboro, Ohio and was charged with unlawful sexual conduct with a minor. Respondent was twenty-two years old and the alleged victim was fourteen. Respondent was convicted of unlawful sexual conduct with a minor in 2007. Respondent is a registered sex offender. The trial court identified Respondent's status being a sex offender as a barrier to reunification.

The trial court changed the primary permanent plan to adoption with a secondary plan of reunification on 3 May 2017. DHHS filed a petition to terminate Respondent's parental rights on 2 March 2018. Respondent did not communicate with DHHS from 9 March 2018 until 18 October 2018.

Respondent obtained a sex offender assessment at the Sandhills Center on 1 February 2018. The assessment inventory of behaviors did not find any "sexual deviant behaviors" from Respondent's answers, but his "Sex Item Truthfulness Scale score is in the Problem Risk (70-89th percentile) range." The assessor recommended Respondent "continue his outpatient treatment to address ongoing concerns."

Respondent reported he had completed a sex offender evaluation with Dr. Roach in Indian Trail during a Child and Family Team Meeting at DHHS consisting of three three-hour sessions with Dr. Roach. Respondent reported he was required

to pay a $3,000 fee to receive the written report. Dr. Roach told DHHS he and Respondent were "never ever to coordinate a date and time for the sex offender evaluation." After Respondent was given the terms and conditions of the evaluation/assessment, Dr. Roach never heard back from Respondent.

Respondent reported he had received diagnoses of post-traumatic stress disorder, bipolar disorder, and attention deficit disorder. Respondent's provider prescribed medication for these conditions and recommended for him to attend a medication management appointment every ninety days. Respondent attended five of these appointments from September 2016 until June 2018.

At the 10 May 2019 permanency planning hearing, the trial court found Respondent continued to live with his mother and wife in Candor. The trial court found the condition of the residence was unsuitable for Alice because there were 15-20 dogs present outside of the home and the flooring of the home was "completely covered and saturated with dog feces and urine."

Respondent's probation officer would not enter the residence because she had found some of the dogs to be "vicious" and an overwhelming odor of dog feces and urine so strong "she could not breathe." Respondent's probation officer described the condition of the residence as "deplorable" and reported it to Richmond County Adult Protective Services.

DHHS was unable to have the Richmond County Department of Social Services visit the residence because Respondent would not respond. Respondent was found to

have not made progress in therapy, having last attended therapy in November 2016. Respondent was employed as a truck driver making $350 to $990 per week, in addition to his monthly Veterans Administration disability payment of $466 per month.

At the hearing the trial court determined Respondent was not "making adequate progress within a reasonable period of time" and was "not actively participating in or cooperating with the plan, the Department, or the Guardian *ad Litem* for his daughter." The trial court stayed the termination of parental rights ("TPR") action because Holley, the mother, was making progress on her case plan.

Respondent informed DHHS he was moving to Montgomery County and would be employed at Carolina Structural System as a truck driver for fifty to seventy-five hours per week making $18.00 per hour. Respondent did not give DHHS documentation of this income. Respondent did not have contact with DHHS from 12 June 2019 until the termination of parental rights hearing on 7 March 2023.

Respondent did not attend the 20 November 2019 permanency planning hearing, the 5 May 2021 hearing to shift Holley's unsupervised visits to supervised visits, or the 8 March 2022 permanency planning hearing.

Respondent was $1,295.75 in arrears of child support at the time of the 8 March 2022 permanency planning hearing. Respondent had not participated in shared parenting with Alice's foster parents since 6 October 2019. The trial court lifted the stay on Respondent and Holley's TPR on 8 March 2022.

DHHS filed a petition to terminate Respondent's parental rights on 3 August 2022. Following a hearing the trial court terminated Respondent's parental rights to Alice for neglect, failure to make reasonable progress, and dependency. *See* N.C. Gen. Stat. § 7B-1111(a) (1), (2), and (6) (2023). Holley's parental rights were terminated to Alice and Ava for the same grounds. Holley did not appeal. Respondent appeals.

## II.     Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b)(2) (2023).

## III.     Issues

Respondent argues the trial court violated his right to counsel and erred by improperly ordering the termination of his parental rights.

## IV.     Right to Counsel

Respondent argues the trial court denied his right to counsel by allowing his attorney to withdraw from 2 August 2019 until 13 August 2022 when the court appointed Respondent an attorney for the TPR action.

### A. Standard of Review

Our Supreme Court has recently addressed a parent's statutory right to counsel and held:

> A trial court's determination concerning whether a parent
> has waived his or her right to counsel is a conclusion of law
> that must be made in light of the statutorily[-]prescribed
> criteria, so we review the question of whether the trial
> court erroneously determined that a parent waived or
> forfeited his or her statutory right to counsel in a
> termination of parental rights proceeding using a *de*

*novo* standard of review.

*In re K.M.W.*, 376 N.C. 195, 209-10, 851 S.E.2d 849, 860 (2020).

## B. Analysis

N.C. Gen. Stat. § 7B-1101(a) mandates parents to be represented by counsel during termination of parental rights actions, unless there is a showing the parent has forfeited or waived such right. N.C. Gen. Stat. § 7B-1101(a) (2023).

After making an appearance before the court, an attorney may not abandon his or her client and case without "(1) justifiable cause, (2) reasonable notice [to the client], and (3) the permission of the court." *Smith v. Bryant*, 264 N.C. 208, 211, 141 S.E.2d 303, 305 (1965). "Where an attorney has given his client no prior notice of an intent to withdraw, the trial judge has no discretion. The Court must grant the party affected a reasonable continuance or deny the attorney's motion for withdrawal." *Williams & Michael, P.A. v. Kennamer*, 71 N.C. App. 215, 217, 321 S.E.2d 514, 516 (1984).

Our Supreme Court has held a parent waives their right to representation when their actions rise to the level of "egregious dilatory or abusive conduct." *In re K.M.W.*, 376 N.C. at 209, 851 S.E.2d at 860 (citation omitted).

Our Supreme Court in *T.A.M.*, explained:

> A parent, by repeatedly failing to communicate with appointed counsel, by failing to attend numerous hearings, and by admittedly avoiding receiving mail and other communications from DSS and other interested parties, could successfully manipulate the judicial system to

seriously delay the termination of parental rights proceeding. Under *K.M.W.*, the trial court would be required to halt a termination-of-parental-rights hearing, track down a parent, ensure the motion to withdraw was properly served and inquire into the efforts made by counsel to contact the parent, . . . all before allowing counsel to withdraw from representation. And under these facts, trial courts would be obliged to re-appoint counsel for it all to begin again. These extensive and burdensome processes would impair judicial efficiency and drain already scarce judicial resources, while thwarting the over-arching North Carolina policy to find permanency for the juvenile at the earliest possible age.

*In re T.A.M.*, 378 N.C. 64, 74-75, 859 S.E.2d 163, 170 (2021) (citations omitted).

The trial court made the following unchallenged findings of fact regarding

Respondent's counsel's withdrawal:

53d. The respondent father was advised of his right to counsel, elected court-appointed counsel previously, and was awarded and confirmed a court-appointed counsel. At some point he then privately retained his own counsel. At some point after his privately retained attorney had made an appearance in the case, [Respondent] signed a Consent Order allowing his privately retained attorney to withdraw. [Respondent] had been previously involved with the court process since the inception of this case. However, in 2019 he stopped engaging in contact with [DHHS], stopped engaged (sic) in the case plan he entered into on June 30th 2016[.]

. . .

54a. At some point, [Respondent]'s court-appointed attorney was replaced with privately[-]retained counsel, and on August 2, 2019, he consented to the withdrawal of his retained counsel. [Respondent] has been going through the court process since the minor child came into custody, and was made aware of this right to counsel, his right to

represent himself, and his right to hire his own attorney. From August of 2019 when he consented to the removal of his retained counsel and at no point thereafter did he petition the Court for new court appointed counsel until years later, after he failed to have any contact with GCDHHS and did not engage with GCDHHS or avail himself to the Guardian Ad Litem for the child. [Respondent] previously exercised his rights to appointed counsel, so his refusal to engaged (sic) with GCDHHS from 2019 until he was appointed Attorney Williams is not a valid excuse for this Court's consideration as justification for his lack of participation in his case plan regarding the juvenile.

Contrary to Respondent's arguments, the trial court's uncontested findings show Respondent had consented to his counsel's withdrawal by signing off on the order to withdraw. Respondent failed to attend and participate in proceedings and refused to disclose his location(s). Respondent waived and forfeited his right to counsel. *Id*. Respondent's argument is overruled.

## V. Termination of Parental Rights

"[A]n adjudication of any single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will suffice to support a termination order. . . . [I]f this Court upholds the trial court's order in which it concludes that a particular ground for termination exists, then we need not review any remaining grounds." *In re J.S.*, 374 N.C. 811, 815, 845 S.E.2d 66, 71 (2020) (citations omitted).

## A. Standard of Review

"We review a trial court's adjudication [to terminate parental rights] under N.C.G.S. § 7B-1111 to determine whether the findings are supported by clear, cogent

and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (citation and internal quotation marks omitted). "The trial court's supported findings are deemed conclusive even if the record contains evidence that would support a contrary finding." *In re L.D.*, 380 N.C. 766, 770, 869 S.E.2d 667, 671 (2022) (citation and internal quotation marks omitted).

Unchallenged findings of fact are presumed to be supported by sufficient evidence and are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." (citations omitted)).

In a termination of parental rights hearing, "[t]he burden in such proceedings shall be upon the petitioner or movant and all findings of fact shall be based on clear, cogent, and convincing evidence." N.C. Gen. Stat. § 7B-1109(f) (2023). When a challenged finding of fact is not necessary to support a trial court's conclusions, those findings "need not be reviewed on appeal." *See In re C.J.*, 373 N.C. 260, 262, 837 S.E.2d 859, 860 (2020) (citation omitted).

## B. Analysis

Courts may terminate a parent's rights to the exclusive care, custody, and control of their child only after certain limited, statutorily-defined grounds are proven. N.C. Gen. Stat. § 7B-1111. A court may terminate parental rights if the

evidence and findings clearly and convincingly demonstrate and support a conclusion:

> The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. No parental rights, however, shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.

N.C. Gen. Stat. § 7B-1111(a)(2) (2023).

Our Supreme Court has outlined the analysis trial courts must perform before terminating a parent's parental rights pursuant to this ground:

> Termination under this ground requires the trial court to perform a two-step analysis where it must determine by clear, cogent, and convincing evidence whether (1) a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, *and* (2) the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child.

*In re Z.A.M.*, 374 N.C. 88, 95, 839 S.E.2d 792, 797 (2020) (emphasis supplied) (citation omitted).

"[A] respondent's prolonged inability to improve her situation, despite some efforts in that direction, will support a finding of willfulness regardless of her good intentions, and will support a finding of lack of progress . . . sufficient to warrant termination of parental rights under section 7B-1111(a)(2)." *In re J.W.*, 173 N.C. App. 450, 465-66, 619 S.E.2d 534, 545 (2005) (citation and internal quotation marks omitted).

"Leaving a child in foster care or placement outside the home is willful when a parent has the ability to show reasonable progress, but is unwilling to make the effort." *In re A.J.P.*, 375 N.C. 516, 525, 849 S.E.2d 839, 848 (2020) (citation, internal quotation marks, and alterations omitted).

Our Supreme Court stated:

> Parental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2). However, in order for a respondent's noncompliance with her case plan to support the termination of her parental rights, there must be a nexus between the components of the court-approved case plan with which the respondent failed to comply and the conditions which led to the child's removal from the parental home.

*In re J.S.*, 374 N.C. at 815-16, 845 S.E.2d at 71 (citation, internal quotation marks, and alterations omitted).

The Supreme Court further explained a parent's non-compliance with case plan conditions are relevant, "provided that the objectives sought to be achieved by the case plan provision in question address issues that contributed to causing the problematic circumstances that led to the juvenile's removal from the parental home." *In re T.M.L.*, 377 N.C. 369, 379, 856 S.E.2d 785, 793 (2021) (citation and quotation marks omitted).

By the time of the termination hearing, Alice had remained in foster care "continuously for 77 months," and Respondent had not made "reasonable progress under the circumstances to correct the conditions that led to removal." Respondent

did not engage with DHHS from 2019 until the TPR petition was filed. Respondent did not complete his assigned case plan. Respondent did not reach out to Alice in any way, and did not request for the Court to allow him to visit her. Here, Respondent, was confirmed as Alice's father only after DHHS had notified him and he requested a paternity test.

"[T]he case plan provision in question address issues that contributed to causing the problematic circumstances that led to the juvenile's removal from the parental home." *Id.* The trial court did not err by terminating Respondent's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(2).

## VI.    Conclusion

Respondent's right to counsel was not violated after he expressly consented to his attorney's withdrawal. Father failed to attend and participate in termination proceedings, refused to disclose his address to DHHS, was unjustifiably difficult to communicate with, was in arrears in his support obligations, and had made little progress complying with his case plan.

Respondent's parental rights were properly terminated under N.C. Gen. Stat. § 7B-1111(a)(2). *See In re T.M.L.*, 377 N.C. at 379, 856 S.E.2d at 793. We need not address Respondent's remaining arguments on appeal regarding grounds for termination pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) and (6). *In re J.S.*, 374 N.C. at 815, 845 S.E.2d at 71 (citation omitted). The trial court's order is affirmed. *It is so ordered.*

AFFIRMED.

Judges GORE and FLOOD concur.